## AFFIDAVIT

I, Hannah Wong, state:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been a Special Agent for the Federal Bureau of Investigation ("FBI") since October 2023. I am assigned to the Economic Crimes Squad of the FBI's Boston Field Office, where I investigate money laundering, wire fraud, mail fraud, and bank fraud, among other complex financial crimes. Before my appointment as a Special Agent, I worked at SpaceX as a financial analyst for four years and as an accountant for two years.

2. I submit this affidavit in support of an application for a criminal complaint charging Keyurkuma K. Patel, also known as "Keyurkumar Patel" ("PATEL"), with money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and for a warrant for PATEL's arrest.

3. As set forth below, there is probable cause to believe that between as early as June 2023 and in or about March 2024, in Massachusetts and elsewhere, PATEL and others agreed to launder more than $1.25 million in United States currency and gold bars that were the proceeds of a scheme to defraud elderly victims.

4. The facts in this affidavit come from my personal knowledge, information provided to me by other law enforcement agents, information I obtained through witness interviews, and my review of the records described below. I do not intend this affidavit to set forth all the information that I have learned during this investigation. It includes only the information necessary to establish probable cause for the requested complaint and arrest warrant.

## OVERVIEW

5. The FBI is investigating a fraud scheme in which unknown subjects ("the Subjects") trick elderly victims into withdrawing their savings in cash or converting their savings

1

to gold and surrendering the cash and gold to the Subjects.

6. Although there is some variation to the scheme, it typically begins when the Subjects cause a notice to pop up on an intended victim's computer screen informing the victim falsely that his or her computer has been infected with a virus. The notice directs the victim to call a specified telephone number for technical support. In reality, the telephone number connects the victim with the Subjects, who impersonate both technical support representatives and federal agents in furtherance of the scheme.

7. The Subjects tell the victim in substance that a hack of the victim's computer has put the victim's assets, including their bank, brokerage, and retirement accounts, at risk. The Subjects also tell the victim that their financial accounts have been connected with criminal activity, including gambling and pornography, and that the victim will face dire consequences, such as prosecution for those crimes, if the victim does not follow the Subjects' instructions.

8. The scheme culminates with the Subjects directing the victim to secure their assets, either by withdrawing cash from the bank or by purchasing gold bars and delivering the cash or gold in person to the Subjects' couriers. As alleged below, the investigation reveals that PATEL is one of the Subjects' couriers and that PATEL is aware that he is picking up the proceeds of some kind of criminal activity.

## **PROBABLE CAUSE**

9. At all times relevant to this affidavit:

   a. PATEL, age 43, lived in Somerset, New Jersey;

   b. Victim 1, age 80, lived in Friendship, New York;

   c. Victim 2, age 75, lived in Jacksonville, Florida; and

   d. Victim 3, age 69, lived in Auburndale, Massachusetts.

*Victim 1*

10. Victim 1 reported to law enforcement that on or about June 6, 2023, Victim 1 received a pop-up warning on their computer indicating that it had been infected by a computer virus.

11. Victim 1 called the telephone number for Microsoft support that was listed in the warning and was instead connected to Subjects purporting to work for Microsoft and the federal government. The Subjects told Victim 1 that Victim 1 appeared to have purchased subscriptions for pornographic websites and to have opened approximately 22 fraudulent bank accounts. In response to a purported federal agent's questioning, Victim 1 revealed the balances of their actual financial accounts.

12. The Subjects told Victim 1 that in order to protect Victim 1's funds, Victim 1 should secure them in a "Government Electronic Wallet," and that an "undercover" federal agent would come pick up the funds. Once the funds had been secured, Victim 1 would be provided with a new Social Security number and a "security package" for Victim 1's computer that would prevent future hacking attempts. After that, Victim 1's case could be closed.

13. At the Subjects' direction, on or about June 13, 2023, Victim 1 withdrew approximately $40,000 in cash from Victim 1's bank account at a financial institution.

14. On or about June 17, 2023, between approximately 9:00 a.m. and 9:30 a.m., the purported "undercover" federal agent drove to Victim 1's home, accepted Victim 1's cash package, and left. Victim 1 described the purported agent's car as a black Toyota RAV4 bearing New Jersey license plate "K50 LOL."

15. In total, Victim 1 lost approximately $40,000.

16. For the reasons stated below, there is probable cause to believe that PATEL was the courier who picked up Victim 1's money.

17. According to New Jersey Motor Vehicle Commission ("NJMVC") records, that agency has not issued a license plate bearing "K50LOL."

18. NJMVC has, however, issued a license plate bearing K50LDL (with a "D" instead of an "O"). That plate is registered to a black Toyota Highlander owned by PATEL through at least April 2025 ("the Highlander"). (Based on my review of images of both car models, the Highlander is similar in shape but slightly larger than the RAV4).

19. CARFAX, Inc. records similarly indicate that PATEL purchased the Highlander in 2019 and has owned it since.

20. According to Lyft, Inc. ("Lyft") records, PATEL has a Lyft driver account and used the Highlander while driving for Lyft between approximately July 2022 and June 2024.

21. Additionally, on June 17, 2023, at approximately 6:46 a.m., a New York State Police license plate reader recorded the Highlander's plate traveling northbound on Interstate 81 near Exit 4 in Binghamton, New York, on a route that could be taken from PATEL's home in Somerset, New Jersey to Victim 1's home in Friendship, New York.
The license plate reader was also approximately 151 miles away from Victim 1's home—a distance that Google's Maps navigation application estimates would take approximately 2 hours and 13 minutes to drive. This distance and estimate align the timing of the camera's capture of the Highlander with Victim 1's recollection of a courier pickup time of approximately 9:00 a.m. to 9:30 a.m. on June 17, 2023.

*Victim 2*

22.     Victim 2 reported to law enforcement that, in or about January 2024, Victim 2 received a call from an individual purporting to be a Xfinity technician offering to work on Victim 2's home internet connection.

23.     During the course of the call, the purported technician informed Victim 2 that Victim 2's account had been hacked.  The technician connected Victim 2 to a Subject purporting to be a Social Security Administration ("SSA") officer.  The purported SSA officer, in turn, told Victim 2 that Victim 2's financial accounts had been connected to terrorist organizations in Russia, Ghana, Mexico, and California, and that Victim 2's money needed to be safeguarded while the SSA worked to clear Victim 2 of federal criminal charges.

24.     On or about January 10, 2024, a Subject impersonating a SSA Officer instructed Victim 2 to withdraw cash from Victim 2's savings account at a financial institution.  Victim 2 was then instructed to deposit the cash into a Bitcoin ATM.  Victim 2 complied and deposited approximately $15,000.  The purported SSA officer then directed Victim 2 to deposit an additional $15,000 into a second Bitcoin ATM, which Victim 2 also did.

25.     The purported SSA officer next instructed Victim 2 to convert Victim 2's assets to gold bars. Following the purported SSA officer's instructions, on five separate dates between January 11, 2024, and February 1, 2024, Victim 2 purchased approximately $977,571.55 worth of gold bars from Ponte Vedra Coin & Estate Jewelry ("PVC&E Jewelry"), a precious metals dealer in Ponte Vedra Beach, Florida.

26.     I have reviewed a receipt from PVC&E Jewelry, which indicates that on or about January 22, 2024, in one of the five transactions referenced above, Victim 2 purchased $348,848 in gold in a variety of sizes and styles.

27. Each time that Victim 2 purchased gold, Victim 2 reported the purchase to the purported SSA officer. After each purchase, a Subject sent a courier to Victim 2's home to pick up the gold.

28. At each pickup, a purported SSA officer called Victim 2 when the courier was outside Victim 2's home. Each time, the purported SSA officer instructed Victim 2 to put the gold into the back seat of the courier's car through a rolled down window. Victim 2 complied each time.

29. In total, Victim 2 lost approximately $1,007,571.55.

30. For the reasons stated below, there is probable cause to believe that PATEL was the courier who picked up gold from Victim 2 on or about January 22, 2024.

31. Victim 2 reported the taking of their savings to the Jacksonville Florida Sheriff's Office ("JSO").

32. A JSO detective reviewed the security camera footage from Victim 2's assisted-living community and determined that a gold pickup had taken place on January 22, 2024, between approximately 2:52 p.m. and 3:07 p.m. The driver's car was a silver Toyota Camry bearing Florida license plate NGGW82 ("the Camry").

33. According to Hertz Corporation ("Hertz") records, a "KEYURKUMA PATEL" rented the Camry on January 22, 2024, at 10:21 a.m. at the Jacksonville International Airport. PATEL used his name, month and year of birth, and driver's license number to rent the Camry.

34. Other records corroborate PATEL's travel to Jacksonville to pick up Victim 2's savings, including:

    a. Lyft records reflecting PATEL's travel from his Somerset home to Newark Liberty International Airport in the early hours of January 22, 2024;

      b.      United Airlines records reflecting PATEL's travel from Newark to Jacksonville on January 22, 2024; and

      c.      Cell site records for the T-Mobile phone number, 732-xxx-3666 ("the 3666 Number"), which PATEL provided to Lyft, Hertz, and United in connection with his travel, reflecting the phone's use over cell towers in the vicinity of Victim 2's Jacksonville home between approximately 11:10 a.m. and 4:01 p.m. on January 22, 2024. This time range aligns with the time range of approximately 2:52 p.m. through 3:07 p.m. on January 22, 2024, when the Camry PATEL rented was recorded entering and leaving the area of Victim 2's home.

*Victim 3*

35.      In or about February 2024, Victim 3's computer made an alarm noise and displayed an alert to call Microsoft for support. When Victim 3 called the listed number for Microsoft, individuals purporting to represent Microsoft and the Federal Trade Commission ("FTC") told Victim 3 that Victim 3's Social Security number had been stolen, and that Victim 3 appeared to have accessed pornography and gambling websites. The Subjects told Victim 3 that their savings would need to be converted to gold and held at the Treasury before a check with "safe" funds could be delivered. The Subjects sent Victim 3 an image of the check that Victim 3 could expect to receive after sending their savings to the Treasury. The Subjects also electronically sent Victim 3 a non-disclosure agreement ("NDA") on purported Department of Justice letterhead, which Victim 3 signed. The NDA indicated that Victim 3 was a victim of identity theft and instructed Victim 3 not to disclose information related to "being hacked on my device, taking Federal Trade Commission's help, [or] [w]orking with the attorney assigned." The NDA also indicated that Victim 3's failure to protect information could lead to "criminal charges and/or assessment of penalties as provided for and allowed by law."

36. At the Subjects' instruction, Victim 3 purchased approximately $218,360.47 in gold online from a precious metals dealer, SD Bullion, Inc., by bank wire. SD Bullion shipped the gold directly to Victim 3's home. The Subjects told Victim 3 that a courier would pick up the gold once it arrived.

37. The gold was delivered to Victim 3 on February 27, 2024. The Subjects instructed Victim 3 that when the gold arrived, Victim 3 was to put the gold on a chair in view of Victim 3's laptop camera so that it could be monitored prior to being picked up. Victim 3 did so and was on the phone with a Subject impersonating an FTC representative, Coconspirator 1 ("CC-1").

38. A driver, later determined to be PATEL for the reasons stated below, arrived at Victim 3's home. CC-1 confirmed with Victim 3 over the phone that the driver had arrived. Victim 3 put the gold package in the driver's car and then walked to the back of the car to take a picture of the car's license plate. PATEL got out of his car, scolded Victim 3 for taking a picture, and demanded that Victim 3 delete the picture. Victim 3 refused, so PATEL got back into his car. Shortly after, CC-1 began to chastise Victim 3 over the phone regarding the picture, which CC-1 must have learned about from PATEL or someone PATEL was communicating with, since Victim 3 had not told CC-1 about the photograph. CC-1 demanded that Victim 3 delete the picture and send CC-1 proof of the deletion, which Victim 3 did.

39. In total, Victim 3 lost approximately $218,360.47.

40. For the reasons stated below, there is probable cause to believe that PATEL was the courier who picked up Victim 3's gold and argued with Victim 3 about photographing his license plate.

41. Victim 3 reported the loss to their bank. Victim 3's bank investigated the loss and was able to recover the photograph of the license plate from Victim 3's phone. Victim 3 provided

the recovered image to the FBI and indicated that it was time-stamped February 27, 2024, at 3:58 p.m.—the date and time of the gold pickup. I have reviewed the image, which depicts a gray Ford Explorer bearing Pennsylvania license plate LYX4593 ("the Explorer").

42. Law enforcement records indicate that the Explorer was owned by Enterprise Rent-a-Car ("Enterprise").

43. According to Enterprise records, PATEL rented the Explorer in North Brunswick, New Jersey for the period between February 21, 2024, and February 28, 2024, using his name, date of birth, home address, New Jersey driver's license number, and the 3666 Number.

44. T-Mobile records revealed that the device associated with PATEL's 3666 Number used a cell tower that covered the vicinity of Victim 3's home at three different times on February 27, 2024, between approximately 3:42 p.m. and 3:58 p.m. The timing of these calls aligns with the timestamp—February 27, 2024, at 3:58 p.m.—of the photo Victim 3 took of the Explorer's license plate outside of Victim 3's home.

*PATEL's Tracking the Price of Gold*

45. In or about January 2025, investigators obtained records from Apple related to the iCloud account subscribed to in PATEL's name and associated with the 3666 Number.

46. Among those records were an image below from www.usagold.com tracking the historic price of gold through March 2024. This image, when considered alongside the evidence described above, provides probable cause to believe that PATEL: (1) was aware of the contents of the victim packages he was picking up; and (2) had some role in the conversion of the gold back to fiat currency.



*Figure 1: March 28, 2024, USAGOLD.com Price Tracking Graph*

**CONCLUSION**

47. Based on the facts above, there is probable cause that between as early as June 2023 and in or about March 2024, in Massachusetts and elsewhere, PATEL, CC-1, and others agreed to engage in financial transactions involving the proceeds of specified unlawful activity, specifically wire fraud, contrary to 18 U.S.C. § 1343, knowing that the cash and gold PATEL picked up represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(h).

_____
Hannah Wong
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to by telephone in accordance with Federal Rule of Criminal Procedure 4.1 this day of August 2025. Aug 21, 2025

_____
Hon. Judith G. Dein
United States Magistrate Judge
District of Massachusetts